SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
BRIAN M. DAUCHER, Cal. Bar No. 174212
bdaucher@sheppardmullin.com
ALICIA L. BURRELL, Cal. Bar. No. 357264
alburrell@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626-1993
Telephone: 714.513.5100

Attorneys for
SYMPHONY HOSPICE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| SYMPHONY HOSPICE, INC. a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>XAVIER BECERRA, Secretary of Health and Human Services,<br><br>Defendants. | Case No.<br><br>**VERIFIED COMPLAINT** |

Plaintiff Symphony Hospice, Inc. ("Symphony"), hereby applies to this Court for injunctive and other relief as set forth below related to the precipitous and unlawful termination of Symphony as a hospice provider without any basic due process or substantial justification. As grounds for this Complaint, Symphony states as follows:

## PRELIMINARY STATEMENT

1. Symphony, a Medicare hospice provider, seeks relief from the unlawful termination of its Medicare provider agreement.

2. By this action, Symphony, a Medicare hospice provider, asks this Court to review and enforce certain procedural rights, duties, and limitations in the Medicare Act designed to protect Medicare providers. Unless enjoined by this Court, Symphony will go out of business, its provision of hospice care to more than 30 current patients will come to an abrupt end, and its' current patients will experience the trauma of being uprooted to a new facility.

3. On September 4, 2025, without prior notice or opportunity to be heard, CMS issued a notice of termination effective just 15 days later September 19, 2025 based on the results of a survey of Symphony's operations covering just four patients. (Ex. A.) The survey (Ex. B, results delivered August 20, with instruction to wait and not respond) was conducted by the California Department of Public Health ("CDPH"), acting as agent for CMS, on July 28-31, 2025.

4. Based upon the survey, CMS alleges that Symphony had condition-level deficiencies that put it out of "substantial compliance." Condition-level deficiencies are defined by the Medicare statutes and regulations to mean deficiencies that substantially limit the hospice's capacity to render adequate care to patients or are of such character as to adversely affect patient health and safety.

5. Symphony disagrees with the contentions that it failed to comply with Medicare conditions of participation. Symphony alleges, variously, that the results of the surveys were: (a) lacking any finding of harm to patient care, including no

immediate jeopardy; (b) based upon erroneous interpretations of CMS guidance, not even regulatory much less statutory violations, (c) not systemic or substantial, and (d) insufficient as a matter of law to warrant the most severe sanction, outright termination.

6. Symphony has filed a DAB Appeal pursuant to its rights under 42 C.F.R. § 498 et seq., but this appeal will not be resolved, on information and belief, for at least 9 months.

7. Unless CMS is enjoined meanwhile from terminating Symphony's provider agreement, Symphony will not have any meaningful opportunity for review of the survey findings before the termination, effectively a death penalty, takes full effect.

## JURISDICTION AND VENUE

8. This action arises under the Social Security Act, 42 U.S.C. §§ 301, et seq., implicating the Medicare Act, 42 U.S.C. §§ 1395 et seq.

9. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1361; under 42 U.S.C. § 405(g) of the Social Security Act, as incorporated into the Medicare Act by 42 U.S.C. § 1395ii; and under the Court's general equity powers. Symphony is also entitled to the judicial relief it seeks pursuant to the Administrative Procedure Act, 5 U.S.C. § 702 et seq.

10. On September 10, Symphony asked CMS to defer its termination for 45 days to review the matter. After numerous emails, on September 18, one day before termination took effect, CMS refused to extend its minimum 15 day notice or to discuss the findings in any way.

11. On September 19, Symphony filed a formal administrative appeal request with the Departmental Appeals Board pursuant to 42 C.F.R. § 498.40 et seq. However, this administrative appeal process will not be completed for approximately nine months, long after termination goes into effect, thus forcing Symphony out of business, and patients out of the program before any review.

Symphony's administrative appeal satisfies the "presentation" requirement necessary for the Court to assume subject matter jurisdiction under 42 U.S.C. § 1395cc(h). The Court may, and should, waive any requirement for the further exhaustion of additional administrative remedies, given the impending termination.

12. In particular, this Court has jurisdiction over this action under 28 U.S.C. § 1331 pursuant to the "no review" exception to the usual Medicare Act requirement of exhaustion of administrative remedies. Exhaustion of administrative remedies under the Medicare Act is not required where exhaustion would mean "no review at all" or "the practical equivalent of a total denial of judicial review." If the Court does not review this matter, Symphony will have no review before irreparable harm takes place (destruction of Symphony's business and goodwill, termination of its employees, possible discharge of its existing hospice patients, and possible uproot trauma to existing hospice patients); and perhaps, as experienced by other similarly-situated providers, at no time at all.

13. Symphony's request for a temporary restraining order and preliminary injunction against CMS' unlawful conduct in terminating its provider agreement is "collateral" and, as a result, this Court may assert jurisdiction under 28 U.S.C. §§ 1331 to resolve collateral statutory and constitutional issues (Court has authority to rule on the federal questions) and 1361 (Court has authority to require Secretary to comply with his mandatory obligations under the Constitution and the law).

14. Venue in this district is proper pursuant to 28 U.S.C. § 1391(e), 42 U.S.C. § 405(g), and 5 U.S.C. § 703.

## PARTIES

15. Plaintiff Symphony Hospice, Inc. is a California corporation that is registered to do business in the state of California, with its principal place of business in Ontario, California. Symphony obtained its license in 2019. Symphony is denoted by its distinct national provider identifier, NPI 1598249567 and distinct Medicare provider number A06177. Current owners, who purchased this provider in

early 2024, include two hospice nurses with more than 15 years in hospice, collectively; they invested their life saving and are passionate about providing comfort and dignity to those requiring end-of-life care.

16. Defendant Secretary of Health & Human Services, Xavier Becerra, administers the Medicare Program. He does so on a daily basis through CMS, a governmental sub-agency within the Department of Health and Human Services. CMS uses State agencies, such as CDPH, to survey providers, including hospices.

**THE RELEVANT MEDICARE PRINCIPLES**

17. Medicare, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., is the federal healthcare program for the aged and disabled. Part A of the Program covers inpatient healthcare services furnished to Medicare beneficiaries through institutional "providers," such as hospitals and nursing facilities. And, it also covers hospice care. Under 42 U.S.C. § 1395x(dd), hospice care means items and services provided to a terminally ill patient by a hospice program under a written plan of care established and periodically reviewed by the individual's attending physician and by the medical director of the program. It includes nursing care, physical and occupational therapy, medical social services, services of a home health aide, medical supplies, physician services, and counseling services, including bereavement services for family members. A hospice program is one which is primarily engaged in providing these services and items. An individual is considered to be "terminally ill" for hospice coverage purposes if the individual has a medical prognosis that the individual's "life expectancy is 6 months or less." *Id.* at § 1395(dd)(3)(A).

18. Hospice programs are subject to surveys by approved accreditation agencies not less than once every three years. 42 U.S.C. § 1395i-6(a)(1). The surveys are to determine a hospice program's compliance with various "standards and conditions of Medicare certification" found at 42 C.F.R. §§ 418.52 et seq. The

results of surveys are required to be recorded and reported on CMS Form 2567 (like Ex. B ), which are published on CMS's public website. 42 U.S.C. § 1395i-6.

19. Where surveys reveal deficiencies that involve "Immediate Jeopardy" (often referred to as "IJ") to the health and safety of hospice patients, CMS must take immediate action to ensure the removal of the jeopardy and correction of the deficiencies or terminate the certification of the hospice program. *Id*. at § 1395i-6(c)(1). Notably, in this case, CDPH did not make any finding that Symphony's practice put patients in immediate jeopardy (or for that matter that any such practice actually harmed patients in any way) (Ex. B.)

20. In the absence of immediate jeopardy (not present here), the statute affords CMS other rights, specifically the Secretary in such other cases "may (for a period not to exceed 6 months) impose remedies developed pursuant to paragraph 6(a)-(c), in lieu of terminating the certification of the program. The Secretary may (1) deny payment, (2) impose civil money penalties, and/or (3) appoint temporary management. 42 U.S.C. § 1395i-6(c); *Ridgeview Manor of the Midland, L.P. v. Leavitt,* 2007 U.S. Dist. LEXIS 26249 (D. S.C. Apr. 9. 2007) (holding, based on the language of 42 U.S.C. § 1395i-6(a)-(c), Secretary shall take action for immediate jeopardy and can terminate, but if there is no immediate jeopardy then the Secretary must follow the lesser enumerated remedies the statute.). If, after such a period of remedies, the program is still no longer in compliance with such requirements, the Secretary shall terminate the certification of the program." *Id*. at § 1395i-6(c)(2). The statutory scheme goes on to specify types of remedies and requires the Secretary to develop regulations. *Id*. at § 1395i-6(c)(4).

21. The Secretary has adopted regulations related its survey function for hospices at 42. C.F.R. § 488.1205 et seq., including a list of factors to be taken into account when selecting a remedy as follows: (a) presence of immediate jeopardy; (b) nature, incidence, manner, degree, and duration of deficiencies; (c) relationship

to quality of care; and (d) problems at other locations or system-wide failures. *Id*. at 42 C.F.R. § 488.1215.

22. Applying these factors, there is no basis in this case for the immediate termination, without any notice or opportunity to be heard of Symphony, a provider with no immediate jeopardy finding, no quality of care findings, and no prior disciplinary history.

23. Congress afforded providers the right to appeal a decision to terminate a license, such as this. 42 U.S.C. § 1395cc(h)(1)(A). Congress mandated that the Secretary develop "a process to expedite" such an appeal where termination is imposed. *Id*. at § 1395cc(h)(1)(C)(i)(I). However, no such expedited appeal process is available.

24. State survey agencies, such as CDPH, must adhere to federal procedures to ensure uniform and consistent application of federal health and safety requirements. And, they must also use CMS-prescribed survey methods, procedures, and forms, including CMS Form 2567. 42 C.F.R. §§ 488.26(c) and (d). CMS has issued a State Operations Manual ("SOM") to implement these provisions. See SOM, Ch. 5, §§ 5000 et seq. Section 5110.3 describes the procedure for Complaint Surveys that find "condition-level" deficiencies, meaning a deficiency that substantially limit the hospice's capacity to render adequate care to patients or are of such character as to adversely affect patient health and safety. Under section 5110.3(a)(3), if CMS elects not to perform a full survey, and conducts a first revisit survey that results in a finding of substantial noncompliance, CMS generally "authorizes a second revisit." CMS may elect not to perform a second revisit if circumstances warrant making an "exception" to this general rule—such as a finding of an Immediate Jeopardy situation on the first revisit survey. If a second revisit is authorized, CMS sends a Form CMS 2567 for the first revisit with notice that substantial noncompliance remains. However, the termination will likely go into effect before the second revisit occurs based on the time period between the initial

complaint survey and the first revisit survey conducted by CDPH here. As a result, absent intervention, Symphony will be forced to shut its doors, transfer its patients, and terminate its employees without the protections of the full procedures contemplated by the applicable Medicare statutes, regulations, and the SOM.

**THE PROCEDURAL FACTS**

25. On July 28-31, 2025, CDPH conducted a "Complaint Validation Survey", including review of just 4 patients that were, or had been, on service with Symphony.

26. According to the findings of the CMS Form 2567 furnished to Symphony on August 20, 2025 (Ex. B), the survey found that Symphony was not in substantial compliance with the following two conditions of participation: 42 C.F.R. §§ 418.100 (Organization and Administration of Services); and 418.102 (Medical Director).

27. Accompanying the CMS Form 2567 furnished to Symphony, on August 20, 2025, the email to Symphony stated that, "At this time CMS is **not** requesting a plan of correction…." (Ex. C) (emphasis original). CMS went on to state that once the CMS review was complete, "CMS will notify [Symphony]" *Id.*

28. On September 4, 2025, two weeks later, CMS then issued a Notice of Termination, asserting that Symphony had violated two conditions of participation, and terminating Symphony's provider agreement on the shortest allowed notice, 15 days, effective September 19, 2025. (Ex. A.)

29. The survey reviewed just 4 patients previously, or then, on service with Symphony. The Findings do not include any finding of immediately jeopardy, any actual patient harm, or any negative patient care findings, nor do they reflect any substantive problems with the treatment of any of these patients.

30. As detailed below, the problems identified were specific, discrete technical issues, some of which are based upon (a) factually erroneous or

incomplete interpretations, and/or (b) an erroneous application of statute and regulation.

31. Factually Erroneous or Incomplete Interpretations. Factually erroneous findings included that:

Patient 1 (Spanish Forms). CDPH contends that patient representative only, or primarily, spoke Spanish. This was not Symphony's experience. In fact, Symphony communicated with the representative in English without difficulty, never received any request for Spanish documents, and also received written correspondence from the representative in perfect English. CDPH never confronted Symphony with this claim, so Symphony never had the opportunity to share its views on this matter. Patient 1, the source of the complaint, was ultimately dissatisfied with Hospice due to discharging service for patient's palliative care election. Ironically, Symphony now stands to lose its license for doing the right thing in this case and discharging the patient due to patient's determination (perfectly fine by itself) to seek curative treatment. Symphony was never asked for its version of these events, nor were these facts ever considered by CMS.

Patient 1-4 (Diagnosis). For each patient, CDPH mischaracterized the terminal diagnosis, stating dismissively that such patients merely suffered from "senile degeneration of the brain." Considering that these findings are then passed along to CMS as its sole source of information, Findings should be complete and accurate. When findings appear to be intentionally incomplete, as in this way, they should be regarded as unreliable in all respects, given that Hospices have no opportunity to be heard.

Patients 1-4 (Documentation/Needs). For each patient CDPH claimed without elaboration that Symphony failed to do sufficient work to obtain documentation or confirm needs of such patient. Symphony believes that the complete record does not support these findings.

Patients 4 (Attending Physician Signature). CDPH faults Symphony for not obtaining the attending physician signature for benefit period one (the only benefit period where this is required; and only if patient in fact has an attending physician). CDPH's own audit findings, however, also confirm that three alleged attending physicians for this patient also refused to speak with CDPH. Although CDPH had this experience itself, it failed to accord Hospice any leeway on this issue. CDPH and CMS both understand that attending physician signatures are simply not always available due to the fact that such physicians are not always willing to sign third-party documents.

32. Erroneous Application of Statute and Regulation: Legally erroneous findings included CDPH's false claim that face to face doctor visit requirements for recertification) require "two separate clinicians to conduct [F2F] assessments." CDPH apparently means to say that Hospice must use one physician to conduct the face to face visit and another distinct physician to then review those findings and, if appropriate, recertify the patient's eligibility. This is not consistent with the Federal statute and regulation, which contain no such requirement. 42 U.S.C. § 1395f(a)(7)(D) (providing only that for certifications past first 180 days, "a hospice physician or nurse practitioner has a face-to-face encounter with the individual to determine continued eligibility"; certainly not specifying that such doctor cannot then also recertify the patient); and 42 C.F.R. § 418.22(a)(4) (merely stating that "a hospice physician or hospice nurse practitioner must have a face to face encounter with each hospice patient whose total stay across all hospices is anticipated to reach the 3rd benefit period."). Nothing herein, or anywhere else, precludes the same physician from then executing a recertification. Indeed, it should be the *preference* (although it is not required) that the *same physician do both*, as the person who conducted the face to face may be in the *best position* to determine further eligibility.

33. Pursuant to 42 U.S.C. § 1395i-6, the Secretary may terminate a Medicare provider agreement if there is immediate jeopardy. In *Ridgeview Manor*, plaintiff, a nursing home provider, sought to prevent termination of its Medicare agreement after a compliance survey revealed only administrative documentation deficiencies and two minor pain management issues—none of which rose to the level of immediate jeopardy. *Id.* at *7–8. Nevertheless, defendant terminated the agreement and refused to accept plaintiff's plan of correction or delay termination. *Id*. at *8, 10–11. Plaintiff argued that termination is authorized only when deficiencies immediately jeopardizes residents, noting the statute's distinction between immediate jeopardy and lesser deficiencies. *Id.* at *22–23. The court agreed, holding that the Secretary may terminate only for immediate jeopardy, and otherwise must impose less punitive remedies first. *Id.* at *23–25. Here, although the Initial Findings do not include any finding of actual patient harm, and certainly no finding of immediate jeopardy to the life of a patient, CMS summarily determined that the alleged deficiencies "no longer qualif[y] [Symphony Hospice, Inc.] for participation as a Hospice in the Medicare program…." (Ex. A.) CMS afforded Symphony no opportunity to discuss the results or even to submit a Plan of Correction.

34. Pursuant to 42 C.F.R. § 488.1215, termination is a potential remedy when a hospice is "out of substantial compliance" with the conditions of participation. But, in considering such a remedy, CMS is to consider, without limitation, the following factors: (a) the extent to which the deficiencies pose immediate jeopardy to patient health and safety; (b) the nature, incidence, manner, degree, and duration of the deficiencies or noncompliance; (c) the presence of repeat deficiencies, the hospice program's overall compliance history and any history of repeat deficiencies at either the parent hospice program or any of its multiple locations; (d) the extent to which the deficiencies are directly related to a failure to provide quality patient care; (e) the extent to which the hospice program is part of a

larger organization with performance problems; and (f) an indication of any system-wide failure to provide quality care.

35. Applying the above factors to the Initial Findings, there is woefully insufficient basis for severe remedies such as payment suspension or termination. Instead, the facts show that: (a) there was no immediate patient jeopardy; (b) the nature of the Initial Findings are technical and not of severe degree; (c) Symphony has no prior history of deficiencies; (d) findings in no case affected actual quality of patient care; (e) there is no larger organizational problem; and (f) there is no system-wide issue. On these facts, termination should not be deployed without notice and opportunity to be heard. CMS inflicted the harshest possible remedy.

36. CMS could have and should have applied other lesser sanctions or actions, such as, corrective action plan and resurvey, training, or other penalties, were never tried. 42 C.F.R. § 488.1220 (listing options); 42 U.S.C. 1395i-6(a)-(c). The regulations themselves contemplate that in the absence of immediate jeopardy, only "repeat" noncompliance that "substantially limits the provider's ability to furnish adequate care" should result in termination. 42 C.F.R. § 488.1230(a). In fact the regulations contemplate a cure period of up to six months. 42 C.F.R. §§ 488.1230(d) and 488.1260 (noting that termination could follow if adverse findings not resolved in 6 months). Instead, CMS fully terminated Symphony's provider agreement.

## IRREPARABLE HARM IS CONTINUING TO RESULT

37. CMS's allegations of inadequate care and organizational practices by Symphony and the resulting termination of Symphony's Medicare participation stigmatize Symphony's reputation and effectively cause Symphony and its owner to be banned from the health care industry. For example, under 42 C.F.R. § 424.530(a)14 and (a)(18), CMS may deny future enrollment in Medicare where a provider has been terminated from the Medicare Program for violating standards and conditions of participation. And, other health care payors routinely condition

participation in health plans, including private health care plans, on a provider's continuing enrollment in Medicare. Yet, CMS has made these without giving Symphony any meaningful opportunity to contest them.

38. CMS's public notice of the September 4, 2025 termination of Symphony's Medicare participation based on the unchallenged allegations in the CMS Form 2567 has already caused and will continue to cause irreparabale harm to Symphony, its employees and its patients. For example, unless the termination is immediately enjoined by this Court, Symphony will have to transfer its existing patients to other hospices, which will be traumatic for the patients and their families, some of which patients are in their very last stages of life. Due to the extremely vulnerable population in nursing homes, courts give careful consideration to the substantial burden to families and trauma of moving a patient to a new nursing home. *Oak Park Health Care Ctr., LLC v. Johnson*, 2009 U.S. Dist. LEXIS 9878, at *7-8 (W.D. La. Feb. 10, 2009) (granting a temporary restraining order against termination for a nursing home due to the "irreparable injury not limited to the patients, as the burden often falls on family members… [and the nursing home] employees"); *Ridgeview Manor*, 2007 U.S. Dist. LEXIS 26249, at *25-26 ("No public interest will be served by displacing and relocating…" elderly patients). During these initial days, Symphony (who retains its state license) continues to provide service to its patients, hoping to survive until CMS relents or the Court enjoins this conduct.

39. However, because Symphony is dependent on Medicare revenues to pay its employees, vendors, and other creditors, the loss of such revenues caused by the termination decision will soon require Symphony to lay off employees and adversely affect payments to creditors. In short order, absent relief, Symphony will go out of business and the patients will undergo the trauma of moving to a new facility. Moreover, as discussed above, the publication of the termination will

necessarily damage Symphony's reputation for providing quality patient care, which is critical to the ability of Symphony to remain in the healthcare industry.

**<u>THE REMEDIES IMPOSED ARE UNLAWFUL</u>**

40. Due process of the law requires that a person (including a corporation) be afforded a meaningful notice and opportunity to be heard prior to being deprived of life, liberty or property. While a provider might not have a property right to continued participation in the Medicare Program, a provider's liberty interest is implicated, invoking procedural due process protections, where (a) the government makes a "charge" that impairs the provider's reputation for honesty or morality, (b) the accuracy of the charge is disputed, and (c) there is some public disclosure of the charge. These elements are present here.

41. Similarly, Congress mandated not only that providers be given hearings on termination, but also that such hearings be expedited, *supra*. CMS has apparently done nothing to protect this express right provided by Congress.

42. In fact, CMS has provided Symphony with no meaningful opportunity to be heard to challenge the charges being made against it. In an attempt to avoid litigation, on September 10, 2025, Symphony requested a 45-day extension to the termination date (September 19, 2025) to allow time to discuss the specific issues. On September 18, 2025, one day before the effective date of termination, CMS simply refused to provide any extension or opportunity to hear Symphony's case. (*Id.*)

43. In any event, under the controlling Medicare statutes and regulations, Symphony should have been given an expedited hearing or, at a minimum, far more process than CMS has furnished Symphony here before termination of the provider agreement. "No public interest will be served by denying [Symphony] an administrative hearing" and the Secretary and government also "shall not incur harm" thereby, under present circumstances. *Ridgeview Manor*, 2007 U.S. Dist. LEXIS 26249, at *25-26; *Oak Park Health* 2009 U.S. Dist. LEXIS 9878, at *8.

44. Symphony alleges that the following CMS conduct is unlawful: (a) terminating Symphony without any opportunity to be heard first, as Congress specified; (b) terminating Symphony in this case without any finding of immediate jeopardy, patient harm, or repeat offense; (c) terminating Symphony, given that it is a hospice without any prior negative disciplinary record. CMS conduct in this regard violates basic procedural and substantive due process and is contrary to the statutory and regulatory scheme as outlined above.

**PRAYER FOR RELIEF**

Based upon the foregoing, Symphony prays as follows:

1. For an order temporarily and permanently enjoining the Secretary and his agents, including CMS and CDPH, from terminating Symphony's Medicare provider agreement until further order of the Court;

2. For suitable related mandamus relief;

3. For costs of suit, including reasonable attorney's fees; and

4. For such other relief as the Court deems to be just and proper.

Dated: September 22, 2025

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By *\/s\/ Brian M. Daucher*
BRIAN M. DAUCHER
ALICIA L. BURRELL

Attorneys for Plaintiff
SYMPHONY HOSPICE, INC.

**VERIFICATION**

I, Princess Nasal, Administrator for Symphony Hospice, Inc., hereby declare under penalty of perjury that I have read the foregoing Verified Complaint, that the factual statements contained therein are true to the best of my knowledge except those stated upon information and belief, as to which I believe such matters to be true.

Executed this 22nd day of September, 2025.

Signed by:
CF4F6A453DC04ED...
PRINCESS NASAL